All right, everybody is settled. The next case for argument is CSMN Investments v. Cordillera Metropolitan, docket 19-1094. Counsel, we're ready to hear your argument today. Good morning and may it please the court. Brian Connolly with the law firm of Ott & Johnson arguing for the appellant. The district court's order in this case presents a problem, and that it provides a clear pathway for legally sanctioned discrimination. It tells would-be discriminators that so long as they choose to effectuate their aims through the filing of litigation, they will be immune from liability. I'd like to focus on three topics in my comments this morning. The first is why Norr Pennington should not be applied to anti-discrimination cases. The second is how the court should evaluate petitioning immunity, particularly with respect to governments and government-like actors in the context of an anti-discrimination case. And the third is the illegality of the defendant's underlying objective and their lack of success in achieving that objective. It's important to remember that CSMN withstood two and a half years of unsuccessful appeals that were prompted by a discriminatory public outcry that followed the announcement of its residential addiction treatment center. The community's stated goal in publicly available emails was to keep those people from being located in their neighborhood. The actions of the Cordillera Metro District and its inextricably intertwined partner, the Property Owners Association, have exacted significant costs and delays on CSMN. But more importantly, it deprived CSMN's prospective patients of housing and treatment during the period it took to resolve those appeals, all of which were conclusively resolved in CSMN's favor. And while CSMN had the financial wherewithal to survive those appeals, there are many other providers of housing and treatment who wouldn't have. This will not be the last time that a facility offering addiction treatment services will seek to locate in a residential neighborhood, and it's certainly not the last time that a discriminatory response will surface, which highlights the importance of getting this case right. So I'll go to my first topic, which is why Norr Pennington should not be applied in the context of this case. Well, we're not talking about Norr Pennington anyway. We don't have an antitrust case here, do we? You're absolutely right, Judge McHugh. That's, in fact, what I was going to say. We're dealing with a First Amendment right to petition defense. That's right, and so, and I think we're also dealing with a fundamentally different statutory structure here. This court, in cartoon, said that it needed to adopt a statute-specific approach to address right-to-petition immunity, and so I'd like to talk about the specific approach that we suggest that the court adopt. In B, E, and K, the Supreme Court observed that there may be circumstances where reasonably based but unsuccessful lawsuits filed in the pursuit of unlawful ends might themselves be found unlawful, and that also followed on the Supreme Court's observation in Bill Johnson's that claims filed with an illegal objective simply fall outside of the First Amendment. Those statements... Well, wait a minute. The Supreme Court's been pretty clear that we've got a two-prong test. First, the suit has to be frivolous. It's got to be objectively baseless, and then, if you can show that prong, then we look at the subjective motive in filing the case. Would you agree that's the Second Amendment right to petition? I don't know that I would agree with that. I think in B, E, and K, the Supreme Court left open the possibility that you might have a reasonably based but unsuccessful lawsuit that is filed with an unlawful motive that would itself be unlawful, and I think that the statements in B, E, and K and Bill Johnson's are actually consistent with long-standing precedent that enjoins or governments and government-like actors. In fact, 70 years ago in Shelley v. Kramer, the Supreme Court considered whether a racially restrictive covenant could be enforced by state courts. There, it applied a constitutional equal protection analysis and determined that state courts could not be used as vehicles for discrimination. This is also the same theory that underlies circumstances where governments themselves seek to enforce discriminatory laws. But the B, E, and K ruling, the majority as well as Justice Scalia's concurrence, certainly point to two prongs, and speak about Bill Johnson's as dicta, and I think Cardoon's would also be dicta, which came before B, E, and K. So what I need to know is, what particularly are you relying on, say, the two prongs are out under B, E, and K? So I'm in part relying on Cardoon's. In Cardoon's, this court observed that a statute-specific approach would need to be developed, and the Supreme Court precedent, so there's the antitrust case. But Cardoon's never suggested that you could get rid of the objectively baseless prong, did it? I don't know that it specifically offered that you could get rid of the objectively baseless prong, but what it said is that a statute-specific analysis would need to be developed when we're dealing with a countervailing interest to the right to petition. Well, that case first of all preceded, didn't it, the Supreme Court cases we're talking about here. Plus, isn't that all that dicta in Cardoon's, which really had a very specific issue for the en banc court there? Sorry, I didn't catch that. It had a very dicta in Cardoon's? I mean, it was in a footnote, and it seemed to suggest that an en banc panel of this court believed that there should be a statute-specific approach developed. And I think there is actually a way. But whatever this court said in professional real estate investors versus Columbia Pictures, the Supreme Court, I think, pretty clearly said only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. I mean, that sounds like a pretty specific directive to me. It is. And I think, again, that's an antitrust case. And then B&K and Bill Johnson's are National Labor Relations Act cases. I think if this court is going to look at the statutory structure of the Fair Housing Act and the ADA to determine what type of test to apply, you have to consider the subjective intent of a plaintiff in filing litigation. Because when we look at, for example... But the subjective anti-competitive intent really isn't any worse than subjective discriminatory intent, right? I mean, they're both ills that Congress decided to pass legislation to protect against. I'm not sure that that's true. I mean, I think there are good policy reasons for why you would apply that objective baselessness as a gatekeeper in antitrust cases. It is sort of... In business, businesses constantly seek favorable terms on which to operate, including with respect to regulation. The government can grant a monopoly in an antitrust situation. Here we're dealing with statutes that prohibit the government from allowing discrimination under any circumstances. And moreover, we as a society have determined based on those pieces of legislation that we don't want to encourage that type of behavior, unlike competitive business behavior, for example. Are you arguing for a different result or a different rule in a Fair Housing Act case than from a National Labor Relations Act case? So I think in this case, the court has an opportunity to create a slightly different rule. And I think that rule can basically be gleaned from this whole volume of cases where you have discriminatory enforcement actions, for example, or a discriminatory condemnation action, discriminatory evictions. None of all of those are sort of deemed as being outside the purview of the First Amendment. I think you can get there and find for us under an objective baselessness analysis as well. What they sought was a result that would have plainly violated federal law. It would have been an interpretation of the PUD that would have allowed residential, medical, and professional office uses to the exclusion of residential treatment. That's something that this court in Bangor found would be a facial violation of the Fair Housing Act and the ADA. And the arguments that they used otherwise were on their face meritless. They tried to argue that the lodge needed to remain open for public access. And that was on its face not permitted by their declaration of covenants, which was available to the entire community. It said that the lodge could be closed or sold at any time. They also sought an interpretation of the PUD that the 34 uses that were listed for this property were ancillary to the lodge use. And that's an interpretation that's plainly belied by the PUD itself. Well, they won on one thing. They won as far as getting the directory versed on outpatient versus inpatient. Well, I don't, I think it's, that can hardly be considered a victory. I don't understand why you would say that. That they don't want outpatient facilities of any kind, regardless of the patients. There's a distinct difference between outpatient, or I'm sorry, inpatient facilities and outpatient. And that was the point. So the proposal that was brought before the Board of County Commissioners was one where housing would occur on one part of the property and treatment would occur on another part of the property. The Board of County Commissioners looked at that. And even though CSMN sought an interpretation that would have allowed inpatient treatment, because it viewed its use as an inpatient use at that time, the Board of County Commissioners saw it otherwise and said, this is not an inpatient use. This is two different uses that occur on the same property. They lost on that issue. They lost. Well, and, well, but CSMN did not, that wasn't a loss for CSMN because the proposal that was before CSMN was to use the property, or before the Board of County Commissioners was to use the property exactly as CSMN had proposed. But they chose, I have trouble with those initials, the acronym, CSMN chose nevertheless to proceed with the argument that it did cover inpatient treatment. They chose that. And therefore, it was in dispute, whether they now want to say we didn't really need that. Does that make sense? CSMN accepted the result that it was outpatient because it didn't do anything to change CSMN's plan. Well, it accepted it, but it challenged it, at least initially. Not following the Board of County Commissioners' decision. Okay. So you're saying everything after that point then was objectively... No, no. So, but, I mean, to sort of put the point in maybe more clear terms, they continued to vigorously appeal the decision that it was an outpatient use. So I don't know how that could possibly be considered a victory for them, given that it resulted in the same plan that CSMN had proposed to the county, and they continued to appeal from it for two and a half years. It's a victory in that CSMN has fewer options. You can't deny that. If CSMN five years from then wanted to have inpatient, it can't do it. Whereas before it could have done it. That's not the result that CSMN saw as part of this approval. Then your position is, so long as they can conclusively prove that something would have happened, then they don't win. And I don't know how you can really say that. They got something. Your client wanted inpatient, got inpatient in front of the director, and lost that on appeal. You can say it's trivial. You can say it doesn't matter. But I don't know how you can say that they didn't win something. I'd like to reserve two minutes for rebuttal, but I'll respond to the question. What CSMN saw was the ability to do a residential treatment center. What they opposed was having a residential treatment center in their community. I would encourage the court to look at the Hanover decision from the Third Circuit, in which it says that success on minor collateral issues is not success for purposes of analyzing whether there was objective merit to a suit. And I would say that since we are now here two or three years after that, because of appeals that they continued to pursue, that that was not success. I'll reserve the rest of my time for rebuttal, if I may. Good morning, Your Honor. Deborah Oppenheimer on behalf of Altitude Community Law. I'll be addressing specifically a small issue, which is the issue of plaintiff's inability to plead a full, complete case. As we said in our briefs, this is not about what the plaintiff has set forth in his appeal brief, nor what they've just argued in front of you. Much of that was not in the second amended complaint. Even though the plaintiff in the lower court amended their complaint two separate times, they failed to meet the Tuambi and set forth distinct facts to demonstrate that, in fact, the actions on behalf of the Property Owners Association, the district, and the 11 individuals named discriminated. What they did was repeat, repeat, repeat. They discriminated. They discriminated. They did this with intent to discriminate. But they never laid out any clear, factual allegations against any of the individuals. Your Honors, the claims don't set forth anything other than legal conclusions. They set forth the facts or the elements as laid out for the claims, but failed to set forth facts to show those and demonstrate those. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice, which is why the district court dismissed the FHA claims against everyone, because they'd failed to be pled by the plaintiff. And this argument's just limited to the members of the legal committee? No. They failed to plead clear evidence that anybody took any action. If you look through the entire, even after they added 13 paragraphs to their second amended complaint, they did that after receiving our motions to dismiss. And they still failed to lay forth any allegation of any delay caused by the Property Owners Association, by the Metro District, or by the 11 individuals. There are no allegations that set forth any facts that any of them took any action. Isn't there circumstantial evidence in the complaint of that? What was pled was... Does it have to be direct? It doesn't have to be direct, but it has to clearly set forth what the action was that causes the delay. There's nothing within the delay, on behalf of any of the individuals, there's nothing that sets forth any specific actions by any of the individuals, or the property owners, or the district. Again, it's just conclusory allegations that this is discrimination, and this is their intent to discriminate, without any specifics. At no point in the complaint, anywhere, is there any details about any action, at any time, that caused any delay. None. They never set forth even any facts, even circumstantial facts, to set forth how, in fact, there was a violation of any of those claims. Thank you. Good morning, Your Honors. Lisa Mickley. I'm going to be speaking to the petition immunity issue. The First Amendment clearly prescribes that Congress shall make no law abridging the right of the people to petition the government for redress of grievances, and yet that is exactly what appellants are asking this court to do. They ask this court to find, in the instance of both FHA and ADA, if there's a potential claim there, that petition immunity should not apply. That is a dangerous argument. It ignores the value of the Bill of Rights and the constraints that the Bill of Rights places on legislation. Isn't there a greater interest in protecting people with disabilities than protecting general competition? I mean, shouldn't we look at what the underlying goal of Congress is in determining what the test is? Perhaps, Your Honor, but I think the Knorr Court made clear that any evaluation needs to weigh appropriately the value and the purpose of the First Amendment, that the Bill of Rights constrains what Congress can do, and so it's within that context that those values have to be valued. What they are asking this court to do will have a significant chilling effect. By way of an analogy, if you had a municipality that had a protected facility and they believe that that protected facility was in some violation of some ordinance, they have a couple of options. One, they could take direct action. They could refuse a permit, send a notice of violation, something like that. That obviously places that municipality at potential risk of a claim under FHA or ADA. Alternatively, they could try and seek a declaratory judgment action. That option would give them the opportunity to get direction from the court to ensure that their view of their ordinance is appropriate and that all of the party's interests are appropriately weighed and get direction before taking direct action. But in this case, Your Honor, the result that the appellants would like this court to enter would equally place that municipality at risk for violations of the ADA or the FHA for doing nothing more than seeking court direction. That leaves the municipality in a pretty significant bind to either take on that burden, a significant burden, or ignoring and not enforcing its own ordinances. Well, certainly the no victory is after the appeal of the director's decision on inpatient, outpatient. Why were the appeals not baseless in view of the overwhelming loss? Well, to be baseless, Your Honor, the Supreme Court has been very clear that to be baseless means that the purpose of the litigation is not the stated purpose of the litigation but an abusive process. That's what baseless is. Not that the arguments are not strong. Not that the arguments don't even prevail in the end. But that the purpose of the litigation is an abusive process. That by engaging in that process, you somehow foreclose the opposing party from exercising their rights or being able to take advantage of the lobbying or the court appropriately. That's how the court is defined. Well, didn't that happen? They waited two years. Your Honor, nothing that our clients did prevented them from taking any action. We never did any direct action. There was nothing we did that foreclosed their purchase of the property, their development of the property, or the use. Well, wait a minute. If they're trying to buy the property for a specific purpose and you make it so they can't tell whether they will be able to pursue that purpose or engage in that purpose, that delays them in purchasing the property unless they're very reckless. But first, they didn't plead that. They didn't plead that they were not able to purchase it. They just generally plead that there was delay. But beyond that, Your Honor, clarification was valuable to both us and to them. What we were seeking to do was obtain clear directions from the courts. They would have been in an equally perilous position if they had purchased it and not had that clarification. So I would say that the process that we went through had a benefit to all parties. Well, you could have accepted defeat and not appealed and they'd have clarification and so would you, right? Yes, Your Honor, but there were interests and values that needed to be vetted for a number of reasons. The value of which the Supreme Court has recognized in terms of litigation, even unsuccessful litigation. It allowed us an opportunity to air the various issues that were out there, none of which, by the way, are the issue that they say was being litigated. Let me turn to that point. Let me ask you one question first just so that I have my bearings. As far as the permitted uses under the planned unit development and then there are 30 plus, the 14th one is the one that's at issue, that language. What if that would have said no addiction treatment centers period? Where would we be with that? That would be a different fact situation. But where would it be? Where would the law be on that? Would you say that you could do that and therefore goodbye to the addiction therapy center? I don't know, Your Honor, that I am familiar enough with all of the case law regarding the FHA or the ADA that I could answer that question definitively. What I can say, however... Well, if you can't say on that that you could do that, then I'm wondering about the merits of your appeal. Well, Your Honor, we never... The premise of their argument here is based on a fallacy. They say to this court that what we were seeking an illegal result because our position was this could be used for a medical facility, it could be used for a residential facility, but it could not be used for addictive treatment. We never made that argument. They don't plead that and it is not in the attachments to their exhibit. What we argued, Your Honor, is that given the history of how the 2009 amendment came about, because given how historically the role of the lodge was in the community, that the language of the PUD was unclear and ambiguous, some direction from the courts was necessary. That's what we argued. We never made the argument that they anchor their entire illegality proposition on. This court needs to recognize as well that there is a clear distinction between what we did here and other cases in which the courts have found that governmental entities were in violation of the ADA and the FHA. We never took any direct action against them. We never took any action which prohibited them from doing anything or otherwise compelled activity, including we never sought any kind of court injunction using the court by way of coercive behavior. All we did was seek direction of the courts. I suggest to you that if there is any case which is entitled to the right to petition immunity protection, it is a case in which no compulsory efforts are being made, but that the tribunal relief is being sought so as to give all parties direction in the case. I think that is a distinctly different thing than situations in which the state or the municipality uses compulsory action to sort of enforce or compel some sort of activity. I would also argue, Your Honor, that their argument on the illegal intent is directly contrary to the heart of the Knorr case and its progeny, which is to say, Knorr found that even if there was a wrongful or illegal intent, that that wrongful purpose could not transform an otherwise lawful activity into a violation. So even if there had been a wrongful intent, which has not been substantiated by the pleadings in this case, that should not and cannot transform an otherwise protected activity, which was merely seeking direction for a PUD, for the interpretation of a PUD, into some sort of unlawful action, unprotected by the First Amendment. They did not plead nor show that we filed this litigation as an abusive process. Nothing in their pleading suggests that it was an abusive process. We filed it for the purposes for which it was to obtain the direction and the clarification needed for the parties. There was also no sham here, Your Honor. There was no series of frivolous litigation that was intended to prevent them from access to the courts, and there was no baseless litigation here, Your Honor. We filed it for the purposes for which we sought, which was merely direction and interpretation by the courts. I will turn it over to Ms. Dale. Good morning, Your Honors. I have very limited time. I did want to address one of the issues that came up in oral argument from the other side, which is the statement that what we sought was a result that was plainly illegal. This ties in somewhat to Ms. Mickley's argument. I want to hit it a little bit more head on. They have said repeatedly that we would not have opposed any use other than the treatment center. It's simply, as Ms. Mickley pointed out, it's not supported by the record. But more than that, it's belied by the record. If you look at the June 6, 2016 notice from Rachel Oiz to the community, she mentions substance abuse treatment facility, but she doesn't just mention a substance abuse treatment facility. She mentions health and wellness. She mentions nutrition. She mentions weight management. So the assertion, which is the fundamental premise of their discrimination claim that we wouldn't oppose any other facility that would have the similar type of uses is just simply unsupported. I also wanted to mention very briefly with respect to qualified immunity, the plaintiffs themselves, if I could just finish this thought. Thank you. The plaintiffs themselves acknowledge that their theory here is novel, that it presents a unique set of circumstances that has not been addressed by the places that they are citing. They cite to, in response to qualified immunity, they cite to Bangor and Cinnamon Hills, which were enforcement actions. They don't apply to these facts. They also apply to their own statements in the BOCC proceeding. The plaintiff's opinion of whether this is what this court does. And they've cited no case from the Tenth Circuit holding that there's clearly established law violating the ADA and the AFAJ under these circumstances. Thank you. Thank you. That's the closest I've ever seen three counsel come to meeting in 15 minutes. And because you did go over 45 seconds, you can take two minutes and 30 seconds to respond. But I've got to hold you to it because we want to be fair. Thank you. I'd like to focus on one point that Ms. Mickley made, which was she focused on the petition clause and her First Amendment concern for a chilling effect. The concern for objective reasonableness under Noor-Pennington and under other petition clause cases, the concern for objective reasonableness is a concern for a chilling effect. However, this is not a case of government action that chills individual rights. And individual rights and concern for a chilling effect have, to my knowledge, never been a factor in a case where a government itself is acting. In fact, it might well be argued that our anti-discrimination laws themselves exist to chill governments from engaging in discriminatory conduct. And so the notion that a municipality or a local government should be able to just be free from liability is probably a difference between an enforcement action that's an eviction and an enforcement action that's trying to enforce a PUD. The notion that they should be free from liability because of a chilling effect just seems totally antithetical to anti-discrimination law that wants to avoid particularly governments from engaging in discriminatory conduct. I would note, and Ms. Dale quoted the district manager, their purpose was to keep this facility out of their community. And the notion that it was about health and wellness or weight loss is just not true. If you saw the barrage of emails that the community sent before this decision was made to appeal the district or the director's interpretation, it was because of the substance abuse piece of this. And so the circumstantial evidence is there, and we respectfully request that you reverse the district court. Thank you. Thank you. The case is submitted. Thank you for your helpful arguments. We've reached the halfway point, three of six cases, and at this point we're going to take a ten-minute break so everyone can relax in the hallway and we'll see you in...